IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NAZAR ABDULMAJEED ALI,           )
                                 )
                Plaintiff,       )
                                 )
        v.                       )          No. 5:20-CV-638-D
                                 )
WORLDWIDE LANGUAGE               )
RESOURCES, LLC,                  )
                                 )
                Defendant.       )


ABDULAMEER KAREEM WALY,          )
                                 )
                Plaintiff,       )
                                 )
        v.                       )          No. 5:20-CV-644-D
                                 )
WORLDWIDE LANGUAGE               )
RESOURCES, LLC,                  )
                                 )
                Defendant.       )

## ORDER

On November 30, 2020, Nazar Abdulmajeed Ali ("Ali") filed a complaint under 42 U.S.C.

§ 1981 and 42 U.S.C. § 2000e against WorldWide Language Resources, LLC ("defendant" or

"WorldWide") alleging race discrimination, national origin discrimination, and retaliation for

complaints of race and national origin discrimination [D.E. 1]. On May 25, 2021, the court

consolidated Ali's case with another action filed by Abdulmajeed Waly ("Waly") (collectively,

"plaintiffs") [D.E. 25]. Waly brings the same claims as Ali and adds an additional claim of disability

discrimination under the Americans with Disabilities Act. See Waly v. WorldWide Lang. Res.,

LLC, No. 5:20-CV-644 (E.D.N.C. Nov. 11, 2020), [D.E. 1]. Ali and Waly contend that their race

is Kurdish and that their national origin is Iraqi Kurdistan.

On October 4, 2022, WorldWide moved for summary judgment on Ali's claims [D.E. 76], and filed a memorandum in support [D.E. 77]. The same day, WorldWide moved for summary judgment on Waly's claims [D.E. 78] and filed a memorandum in support [D.E. 79]. WorldWide filed a statement of material facts [D.E. 80] and appendix [D.E. 81] in support of both motions. On November 8, 2022, Ali responded in opposition [D.E. 88], and Waly responded in opposition [D.E. 93]. Plaintiffs jointly filed an amended statement of material facts [D.E. 94], and amended appendix [D.E. 95]. On December 5, 2022, WorldWide replied. See [D.E. 100–01].

On October 4, 2022, Ali moved to strike WorldWide's confidential designations of discovery materials [D.E. 82] and filed a memorandum in support [D.E. 83]. On October 17, 2022, WorldWide responded in opposition [D.E. 84].

On December 5, 2022, WorldWide moved to strike the declaration of Rasty Qader from plaintiffs' statement of material facts for failure to timely disclose [D.E. 98] and filed a memorandum in support [D.E. 99]. On December 8, 2022, Ali responded in opposition [D.E. 103]. On December 20, 2022, WorldWide replied [D.E. 104]. As explained below, the court denies plaintiffs' motion to strike, grants WorldWide's motion to strike the declaration of Rasty Qader, and grants WorldWide's motions for summary judgment.

I.

Ali and Waly allege similar claims, but the factual backgrounds of their claims differ. Thus, the court describes the facts relevant to Ali and Waly separately.[1]

_____

[1] Plaintiffs' response to WorldWide's statement of material facts has several deficiencies. For many of WoldWide's factual claims, plaintiffs either make vague, blanket objections (including questioning the relevance of the facts) or make argumentative responses without citing the record. See, e.g., PSOF [D.E. 94] ¶¶ 1–12, 29–30, 68–69. Under Local Civil Rule 56.1, a party opposing

2

## A.

On March 11, 2015, WorldWide hired Ali to serve as an at-will Category II Kurdish/Arabic linguist on a three-week mission. See WorldWide Statement of Facts ("WWSOF")[D.E. 80] ¶ 21; Ali Dep. [D.E. 81-5] 9. On May 31, 2015, WorldWide rehired Ali in May 2015 to serve as a linguist in support of a United States Military Client ("U.S. Military Client") in Iraq. WWSOF ¶ 23; Plaintiffs' Statement of Facts ("PSOF") [D.E. 94] ¶ 23; Ali Dep. at 9.

During the time relevant to each complaint (i.e., 2018 and 2019), WorldWide maintained an employee handbook ("handbook"), equal employment opportunity policy ("EEO policy"), open door complaint policy ("open door policy"), and anti-harassment policy. See WWSOF ¶¶ 25–30; PSOF

---

a motion for summary judgment shall submit "a separate statement including a response to each numbered paragraph in the movant's statement [of material facts]." Local Civ. R. 56.1 (a)(2). "Each numbered paragraph in the movant's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Id. "Each statement by the movant or opponent . . . must be followed by citation to evidence that would be admissible, as required by Federal Rule of Civil Procedure 56(c)." Local Civ. R. 56.1(a)(4). Under Rule 56(c), a party disputing a material fact must support its position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)(B). Merely responding that a party "disputes" a material fact does not suffice under Rule 56 and Local Civil Rule 56.1. See Howard v. Coll. of the Albermarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished).

Courts in the Eastern District of North Carolina routinely consider facts admitted for the sake of summary judgment when the party opposing the motion fails to follow Local Rule 56.1 and Federal Rule 56(c). See, e.g., Ferrante v. Westin St. John Hotel Co., 559 F. Supp. 3d 492, 498 n.2 (E.D.N.C. 2020), aff'd, No. 20-1322, 2022 WL 396022 (4th Cir. Feb. 9, 2022) (per curiam) (unpublished); Horton v. Methodist Univ., Inc., No. 5:16-CV-945, 2019 WL 320572, at *1 n.1 (E.D.N.C. Jan. 23, 2019) (unpublished), aff'd, 788 F. App'x 209 (4th Cir. 2019) (per curiam) (unpublished); Felton v. Moneysworth Linen Serv., Inc., 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018); Howard, 262 F. Supp. 3d at 329 n.1. Here, the court follows that principle concerning the statements in plaintiffs' reply to defendant's statement of material facts that fail to comport with the Federal Rules of Civil Procedure and this court's local rules.

¶¶ 25–30. The handbook, EEO policy, and anti-harassment policy directed employees to immediately report to human resources, legal, or an employee hotline whenever an employee experiences discrimination or harassment in the workplace. See WWSOF ¶¶ 27–30. These policies also stated that WorldWide prohibits discipline or retaliation for employees reporting harassment or discrimination claims. See id.

WorldWide delivers operational linguist services to U.S. Special Operations forces throughout the world. See Fackender Decl. [D.E. 81-2] ¶ 2. In 2018 and 2019, Site D encompassed WorldWide's operations in Iraq and is the location at issue in this case. At Site D, WorldWide supported its contract with the United States Special Operations Command (the "SOCOM contract"). See id. ¶ 3.

In 2018 and 2019, WorldWide had anywhere from 65 to over 100 linguists assigned to Site D. See id. ¶ 6. WorldWide's site manager at Site D primarily interacted with the U.S. Military Client's J-2 (Intelligence) leader. See id. ¶ 7. The J-2, or U.S. Military Client Team Leader, during 2018 and 2019, was Lea Pavlu (March 2018 to August 2019), Joseph Gagnard (August 2018 to January 2019), Major Jeremy Shute (January 2019 to June 2019), and Master Sergeant Christopher Ledbetter (July 2019 to November 2019). See Ali Dep. at 11–12.

The WorldWide site manager was assisted by two on-site coordinators. The WorldWide site manager did not supervise WorldWide linguists during the day-to-day performance of linguist duties. See Fackender Decl. ¶ 8. Instead, the U.S. Military Client assigned linguists to work with various SOCOM military teams in Iraq. See id.

Each SOCOM military team was led by a military team leader who is not affiliated with WorldWide. See id. ¶ 10. The SOCOM military team was then supplemented with 8 to 12 Site D

4

linguists employed by WorldWide and stationed in Iraq. See id. At any given time, one or two Site A linguists who were employed by WorldWide in Fayetteville, North Carolina, and who deployed with specific military teams also supported a SOCOM military team. See id. ¶ 11.

Ali was a Site D linguist. The Site D linguists were housed in Iraq on a secure base, and the WorldWide site manager did not generally have access to the base due to military operational and security reasons. See id. ¶ 14. Linguists ate, slept, and worked on the secure base.

On March 13, 2018, Ali called Robyn Dickenson ("Dickenson"), WorldWide's director of human resources, and complained about Ali's supervisor and WorldWide's Site D manager, Umut Daneshpayeh ("Daneshpayeh"). See WWSOF ¶ 31; PSOF ¶ 31. Ali cited a per diem dispute, work in different geographic regions, and Daneshpayeh's moodiness and unprofessionalism in written and oral communication. See WWSOF ¶ 31; PSOF ¶ 31. Ali contends, and WorldWide disputes, that Ali also discussed Daneshpayeh's alleged "open hostility towards Kurdish people and the discrimination that follows." Compare PSOF ¶¶ 31, 132 with WWSOF ¶¶ 33–34. Ali contends he mentioned Daneshpayeh's hostility and discrimination towards Kurdish linguists on the phone to Dickenson and not in writing in order to protect Ali's security clearance. See PSOF ¶ 132.

On March 26, 2018, Ali emailed Dickenson and asked Dickenson for an update regarding his complaints about Daneshpayeh. See WWSOF ¶ 32; PSOF ¶ 32. Dickenson responded to the five issues that Ali mentioned in his email. See Ali Dep. at 26–27. Dickenson told Ali: (1) WorldWide had an open door policy and that Daneshpayeh could not prevent Ali from contacting corporate or human resources; (2) human resources is where WorldWide handles employee relations; (3) the program team had resolved Ali's per diem issue; and (4) SOCOM and the language of a given contract would determine when, where, and whether a linguist rotated and when the rotation would

5

occur. See WWSOF ¶¶ 32–39. With respect to the fifth issue, Ali had complained to Dickenson that Daneshpayeh was moody and unprofessional in his oral and written communication. See id. ¶ 32. Dickenson responded that Ali did not work daily with Daneshpayeh, that Daneshpayeh had not created a hostile work environment, and that Daneshpayeh was moody. See id. ¶ 36. Dickenson also told Ali that there would soon be a new site manager for site D. See Ali Dep. at 28.

As part of Dickenson's investigation of Ali's mid-March 2018 complaint, Dickenson spoke to several other linguists who Daneshpayeh supervised and found that the other linguists did not share Ali's concerns about moodiness and lack of professionalism in written and oral communication. See WWSOF ¶ 36; PSOF ¶ 36. Nonetheless, Dickenson's investigation yielded other reports of rude conduct by Daneshpayeh. Thus, WorldWide demoted Daneshpayeh and transferred him to a work site outside Iraq. See WWSOF ¶ 37; PSOF ¶ 37. In early May 2018, Timothy Fackender ("Fackender") replaced Daneshpayeh as the site manager for Site D. WWSOF ¶ 37; PSOF ¶ 37; Fackender Decl. ¶¶ 3–4.

On September 1, 2019, WorldWide promoted Ali from a Category II to a Category III linguist and began making preparations for Ali's secret clearance to be upgraded to a TS-SCI clearance. See WWSOF ¶ 40; PSOF ¶ 40. Despite this promotion, in early September 2019, WorldWide learned that the U.S. Military Client had decided to release Ali from the SOCOM contract. See WWSOF ¶ 42; PSOF ¶ 42. Ali and WorldWide dispute the reasons that the U.S. Military Client decided to release Ali from the SOCOM contract. Compare WWSOF ¶¶ 43–46 with PSOF ¶¶ 43–46. However, WorldWide received an "Official Memorandum for Record" ("Memorandum") outlining the U.S. Military Client's reasons for releasing Ali from the SOCOM contract. See

6

WWSOF ¶ 47; PSOF ¶ 47.[2] The Memorandum gave three reasons for the U.S. Military Client's decision to terminate Ali from the SOCOM contract: (1) Ali "failed to adapt to the pace, precision required, and demands of the linguist position here with the JTF [Joint Task Force]"; (2) Ali "bypassed the military chain of command on multiple occasions"; and (3) Ali had "on more than one occasion, made unwelcomed advances towards a U.S. military female." WWSOF ¶ 47. The Memorandum did not reference Ali's race, national origin, or Ali's March 2018 complaints to Dickenson regarding Daneshpayeh or any other complaints that Ali made to WorldWide. See WWSOF ¶¶ 49–50; PSOF ¶¶ 49–50. WorldWide did not independently investigate the U.S. Military Client's decision or reason for terminating Ali from the SOCOM contract. See WWSOF ¶¶ 51–53. Without access to the U.S. Military Client's facility due to the termination of Ali's SOCOM contract, Ali could not perform his job with WorldWide. See WWSOF ¶ 54; PSOF ¶ 54.

On September 13, 2019, WorldWide terminated Ali's employment due to Ali's removal from the SOCOM contract and inability to access the U.S. Military Client's facility in Iraq. See WWSOF ¶ 55. During Ali's exit interview, Ali did not allege discrimination, harassment, or retaliation. See WWSOF ¶ 59; PSOF ¶ 59.

In light of Ali's termination from the SOCOM contract, WorldWide sent the United States an incident report as required by law for employers sponsoring employees holding security

---

[2] Ali contested the existence of an earlier email allegedly sent from the U.S. Military Client to WorldWide outlining the reasons for Ali's contract termination. See PSOF ¶¶ 41–47. According to Ali, the email is allegedly classified and WorldWide failed to produce the email to plaintiffs before the summary judgment motion. See id. Plaintiffs incorporate this argument in their objection to the Memorandum. However, plaintiffs do not claim in their statement of facts reply that WorldWide did not produce the Memorandum. In fact, plaintiffs concede the authenticity of the Memorandum, and Ali appears to be familiar with how the U.S. Military Client creates such memoranda. See PSOF ¶¶ 48–50. Thus, the court considers the Memorandum.

clearances. See WWSOF ¶¶ 60–70; PSOF ¶¶ 60–70. Along with this report, WorldWide also sent Ali's statements challenging the U.S. Military Client's decision to terminate Ali from the SOCOM contract. See WWSOF ¶ 70; PSOF ¶ 70.

On November 5, 2020, the United States adjudicated Ali's case and declined to revoke Ali's TS-SCI clearance. See WWSOF ¶ 72; PSOF ¶ 72. In August 2020, while this litigation was pending, Ali signed a letter agreeing that WorldWide could submit Ali's name as a potential linguist in a contract bid proposal. See WWSOF ¶ 77; PSOF ¶ 77.

## B.

On June 28, 2018, WorldWide hired Waly as a Category II Kurdish/Arabic linguist to serve on a SOCOM contract in Erbil, Iraq. See WWSOF ¶ 78. The same WorldWide handbook and policies that applied to Ali also applied during Waly's employment. See WWSOF ¶¶ 79–80; PSOF ¶¶ 79–80. When WorldWide onboarded Waly, Waly indicated that he had a disability but confirmed that he had no work-related disability restrictions and did not request any disability accommodations. See WWSOF ¶¶ 81–82; PSOF ¶¶ 81–82. At no time did Waly ask WorldWide for a disability accommodation. See WWSOF ¶ 83; PSOF ¶ 83.

On July 31, 2018, Waly emailed WorldWide and expressed his intent to resign by September 1, 2018. See WWSOF ¶ 84; PSOF ¶ 84. Waly told Fackender that Waly's supervisors failed to assign Wally enough missions and Waly felt like he was not getting a chance to use his Kurdish skills. See WWSOF ¶ 84; PSOF ¶ 84. When Fackender spoke with the U.S. Military Client Team Leader about these issues, he explained that he selected other linguists because of their experience and trust developed over more time on the job. See WWSOF ¶ 85; PSOF ¶ 85. After Fackender told Waly what the U.S. Military Client Team Leader said, Waly decided to continue working on the

8

SOCOM contract. See WWSOF ¶ 85; PSOF ¶ 85.

In May 2019, Waly again told Fackender that he intended to resign. See WWSOF ¶ 86; PSOF ¶ 86. Waly did not detail why he intended to resign, but generally cited "drama" within the unit. See WWSOF ¶ 86. Nonetheless, Waly did not resign at this time either. See id. Waly, however, claims that a fellow linguist, Ahmed El Sayd, stated that if anyone else complained to Fackender that they "won't be able to say [sic] on base even one night." PSOF ¶ 86. Waly perceived this statement as a threat. See id.

On September 24, 2019, Waly sent his third notice of resignation. See WWSOF ¶ 87; PSOF ¶ 87. The parties disagree on why Waly resigned. WorldWide claims that Waly resigned due to family issues and his daughter's health issues. Waly claims that the "untenable situation at the Site" due to "continuous bullying, ethnic conflict, [and] . . . toxic workplace" arising from anti-Kurdish discrimination also played a role in Waly's decision to resign. Compare WWSOF ¶¶ 87–88 with PSOF ¶¶ 87–88. Waly also claims to have known about Ali's supposed pretextual firing on September 13, 2019, and feared that WorldWide would fire Waly next. See PSOF ¶¶ 87–88.

On November 3, 2019, Waly's resignation became effective and Waly participated in an exit interview. See WWSOF ¶ 94; PSOF ¶ 94. During the exit interview, Waly referenced "bullying, ethnic conflict and disability discrimination" among the reasons for his resignation. See WWSOF ¶ 96; PSOF ¶ 96. Although Waly now claims to have complained repeatedly during his employment about these problems, Wally admits that he did not file "any written substantive complaints by email or otherwise" with WorldWide's human resources department or anyone else in order "to protect his security clearance." PSOF ¶ 97; cf. WWSOF ¶ 97. Following Waly's exit interview, Waly sent additional details to Dickenson regarding the alleged bullying and discrimination. See WWSOF ¶

9

102; PSOF ¶¶ 98, 102.

WorldWide began investigating Waly's complaints following the exit interview. WoldWide's investigation was ongoing when Waly retained counsel and filed a charge of discrimination with the EEOC. See WWSOF ¶¶ 104–05; PSOF ¶¶ 104–05. Wally has not returned to work as a linguist since his separation from WorldWide. See WWSOF ¶¶ 118–19; PSOF ¶¶ 118–19.

## II.

Plaintiffs ask the court to strike WorldWide's "confidential" designations as to discovery material for which WorldWide cannot show good cause or alternatively to vacate the consent protective order. See [D.E. 82]. WorldWide responds that plaintiffs' motion is moot, untimely, and meritless and asks for reasonable attorneys' fees. See [D.E. 84].

The consent protective order defined "confidential information" as:

> any information, documents, testimony, or tangible things ("Information") . . . regarded by a party as confidential or private information, including proprietary data, trade secrets, other valuable or commercially sensitive information, medical records, confidential and private information concerning parties, witnesses, and persons not party to this action, or commercially sensitive or otherwise confidential information.

[D.E. 42] ¶ 1. According to plaintiffs, WorldWide provided depositions with redactions and over 900 documents in three production batches which it labeled "confidential." [D.E. 82] 2. WorldWide also allegedly sought to label two witness deposition transcripts as confidential. See id. at 3.

As for the two deposition transcripts, this issue is moot. The deposition transcripts that plaintiffs referenced are on the docket unredacted and were available before plaintiffs filed this motion. See [D.E. 81-7]; [D.E. 81-8]; [D.E. 81-9].

Plaintiffs' motion also is untimely. Local Civil Rule 7.1(a) states that "[a]ll motions in civil

10

cases except those relating to the admissibility of evidence at trial must be filed on or before 30 days following the conclusion of the period of discovery." Local Civ. R. 7.1(a). On August 23, 2022, discovery in this case ended. [D.E. 84] 4. On September 22, 2022, the court extended the deadline for filing dispositive motions, but the court did not extend the date for other motions. See [D.E. 70]. In fact, Magistrate Judge Robert Numbers denied plaintiffs' untimely motion to compel. See [D.E. 85]. On October 4, 2022, plaintiffs filed this motion. [D.E. 82]. On this record, the court denies as untimely plaintiffs' motion to strike.

Alternatively, plaintiffs' motion is meritless. Notably, plaintiffs violated the local rules by not attempting to consult with defendants before submitting their motion. See Local Civ. R. 7.1(c)(2). In fact, plaintiffs explicitly refused to tell WorldWide what documents and what designations plaintiffs disputed. See [D.E. 84-1]. The consent protective order, however, has a mechanism that plaintiffs must follow concerning such disputes. See [D.E. 42] ¶¶ 8, 10–12. Plaintiffs did not follow the procedure. Furthermore, the documents that WorldWide filed for the motions for summary judgment are on the public record and are not redacted. Therefore, the court denies plaintiffs' motion to strike. The court also denies WorldWide's request for attorneys' fees.

III.

WorldWide asks the court to strike the declaration of Rasty Qader ("Qader") [D.E. 92-4] and asks the court not to consider the declaration in evaluating WorldWide's motions for summary judgment. See [D.E. 99] 1; Fed. R. Civ. P. 37(c)(1). Plaintiffs did not identify Qader as a potential witness in their initial disclosures or amended disclosures under Federal Rule of Civil Procedure 26 and also failed to identify him in response to WorldWide's interrogatories seeking identification of people known or believed to have relevant information. See [D.E. 99] 2. Plaintiffs respond that

11

their document production on May 12, 2022, included a one-page statement by Qader which largely matches the information in Qader's April 10, 2022 declaration and that this one-page statement included Qader's name, address, email, and phone number. See [D.E. 103] 3; [D.E. 103-4] 3. Plaintiffs argue that although they did not include Qader in their Rule 26(a) or (e) disclosures or responses to WorldWide's interrogatories, the single-page disclosure of May 12, 2022, suffices. See [D.E. 103] 9. Alternatively, plaintiffs argue that there is no unfair surprise or prejudice from their failure to make the required Rule 26 disclosures or to timely respond to WorldWide's interrogatories. See id. at 10.

The information in the May 12, 2022 production provides Qader's name, address, email, and phone number. Compare [D.E. 92-4] with [D.E. 103-3]. The production also states that Qader knew Ali, heard about discrimination involving Ali, and observed discrimination against Kurdish translators in Iraq. See [D.E. 103-4] 3. Qader's declaration, however, is riddled with hearsay. See id. The information Qader heard about the alleged discrimination against Ali and other Kurdish translators came from an individual named only as "Salam." See id. Qader provides no identifying information about "Salam" in the May 12, 2022 production or the April 10, 2022 declaration. Other than Salam's first name, plaintiffs contend that they do not know any more information about Salam. See [D.E. 103] 10.

In Hoyle v. Freightliner, LLC, 650 F.3d 321 (4th Cir. 2011), Hoyle attempted to introduce a declaration from a witness who Hoyle failed to disclose under Rule 26(a)(1)(A)(i) and (e)(1). See Hoyle, 650 F.3d at 329–30. Hoyle argued that she mentioned the witness in her deposition and in her initial disclosures. See id. at 330. The district court, however, found that Hoyle had failed to identify the witness in her initial disclosures or in response to specific discovery requests which

12

"expressly sought identification of potential witnesses and persons with relevant knowledge." Id. The district court also found that Hoyle's failure to timely disclose the witness was not substantially justified or harmless. See id. at 329. Given these findings, the Fourth Circuit affirmed the district court's decision under Rule 37 to exclude the witness's testimony. See id. at 329–30.

As in Hoyle, plaintiffs failed to disclose Qader in their Rule 26 disclosures, amended Rule 26 disclosures, or in response to WorldWide's interrogatories. Moreover, when WorldWide asked Ali during his deposition for any other people who could have information, Ali did not name Qader or "Salam." See [D.E. 81-5] 70. Plaintiffs' argument that Ali somehow was attempting to clarify WorldWide's deposition question is based on a tortured reading of the deposition transcript, and the court rejects it. Cf. [D.E. 103] 8.

Plaintiffs' disclosure of the one-page document referencing Qader's statements does not comply with Rule 26. See Fed. R. Civ. P. 26(a)(1)(A)(i), (e)(1). Although the one-page document includes Qader's information and relevant testimony, plaintiffs did not timely identify Qader or Salam as people likely to have discoverable information or as witnesses in their initial disclosures, amended disclosures, or response to interrogatories. In light of plaintiffs' failures to timely disclose Qader or Salam in the initial disclosures, amended disclosures, interrogatory responses, or depositions, this one-page document does not suffice under Rule 26(a)(1)(A)(i) or (e)(1). See Hoyle, 650 F.3d at 329–30.

Under Rule 37(c)(1), the court must assess whether the nondisclosure was substantially justified or harmless. See Fed. R. Civ. P. 37(c)(1); S. States Rack & Fixture v. Sherwin–Williams Co., 318 F.3d 592, 596 (4th Cir.2003). The court must consider surprise to the party against whom the witness was to have testified, the ability of the party to cure the surprise, the explanation for the

13

failure to disclose, and the importance of the testimony. See S. States, 318 F.3d at 596.[3] These four factors favor exclusion. WorldWide did not know plaintiffs would use Qader or Salam as a witness until plaintiffs responded to WorldWide's motions for summary judgment, and WorldWide has been unfairly surprised. WorldWide does not have the ability to cure the surprise. Moreover, plaintiffs' excuses for their failure to timely disclose Qader and Salam are weak, and Ali seeks to use Qader's testimony in opposition to WorldWide's motion for summary judgment. To permit Ali to use the declaration would unfairly prejudice WorldWide. Furthermore, there is little prejudice to Ali from exclusion. The most relevant allegations in Qader's declaration consist of inadmissible hearsay from an individual known only as "Salam" and would not affect the court's analysis at summary judgment. Cf. Fed. R. Civ. P. 56(c)(4); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). Accordingly, plaintiffs' nondisclosure was not substantially justified or harmless, and the court grants WorldWide's motion to strike Qader's declaration.

## IV.

WorldWide moves for summary judgment on all claims. Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the

---

[3] Southern States lists five factors, but one of those factors is the extent to which allowing the testimony would disrupt the trial. See S. States, 318 F.3d at 596. That factor is not relevant in this case. The court has not set a trial date.

14

nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248. The court analyzes the claims under Title VII and Section 1981 in the same way. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004); Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543–45 (4th Cir. 2003); Henry v. Vaughn Indus., LLC, 450 F. Supp. 3d 671, 678 n.2 (E.D.N.C. 2020).

A.

Ali and Waly assert hostile work environment claims under Title VII and section 1981. To demonstrate a hostile work environment claim, an employee must prove that (1) he experienced unwelcome conduct, (2) the conduct was based on a protected characteristic under the relevant statute, (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment

15

and create an abusive atmosphere, and (4) the conduct is imputable to the employer. See, e.g., Laurent-Workman v. Wormuth, 54 F.4th 201, 210–12 (4th Cir. 2022); Chapman v. Oakland Living Ctr., Inc., 48 F.4th 222, 228 (4th Cir. 2022); Perkins v. Int'l Paper Co., 936 F.3d 196, 207–08 (4th Cir. 2019); Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 302 (4th Cir. 2019); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc); Okoli v. City of Balt., 648 F.3d 216, 220–21 (4th Cir. 2011); E.E.O.C. v. Fairbrook Med. Clinic, P. A., 609 F.3d 320, 327 (4th Cir. 2010); Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc); Fox v. Gen. Motors Corp., 247 F.3d 169, 175–76 (4th Cir. 2001); Coleman v. Altec, Inc., No. 5:16-CV-954, 2018 WL 4289610, at *3 (E.D.N.C. Sept. 7, 2018) (unpublished); Brown v. Wake Cnty. Gov't, No. 5:16-CV-806, 2017 WL 2982971, at *5 (E.D.N.C. July 12, 2017) (unpublished). An employee also must show that his protected characteristic was the "but for" cause of the alleged harassment. See, e.g., Gilliam v. S.C. Dep't of Juvenile Just., 474 F.3d 134, 142 (4th Cir. 2007). Summary judgment is appropriate if "the facts are clearly insufficient to satisfy the standard," but not if there is a "close question and reasonable minds could differ when weighing all the facts against the law." Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 208 (4th Cir. 2014) (quotations omitted).

To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and create an abusive working environment based on a protected characteristic, the court examines the allegations both subjectively and objectively. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). First, the employee must subjectively consider the conduct to be sufficiently severe or pervasive as to alter his conditions of employment. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v.

16

City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto, 786 F.3d at 277. Second, a court views the conduct from the perspective of a reasonable person in the employee's position to determine whether it is objectively severe or pervasive. See, e.g., Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 787–88; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998); Boyer-Liberto, 786 F.3d at 277.

The objective component helps courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). The court considers all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Forklift Sys., Inc., 510 U.S. at 23; see Parker, 915 F.3d at 304. The conduct must be severe or pervasive to be actionable. See Forklift Sys., Inc., 510 U.S. at 23; Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277–78. Title VII and section 1981 do not create "a general civility code for the American workplace." Oncale, 523 U.S. at 80; see Irani v. Palmetto Health, 767 F. App'x 399, 416 (4th Cir. 2019) (per curiam) (unpublished). Rather, the "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277–81. Simple teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68–69 (2006); Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788; cf. Chapman, 48 F.4th at 228–34; Boyer-Liberto, 786 F.3d at 277–81. Likewise, mere rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Bonds v. Leavitt, 629 F.3d 369, 385–86 (4th

17

Cir. 2011); Baqir v. Principi, 434 F.3d 733, 746–47 (4th Cir. 2006); see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; cf. Chapman, 48 F.4th at 228–34; Boyer-Liberto, 786 F.3d at 277–81; Walker, 775 F.3d at 207–10; Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli, 648 F.3d at 220–22. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by simple recitation of the words used or the physical acts performed." Oncale, 523 U.S. at 81–82. "Common sense, and an appropriate sensitivity to social context," will enable courts to distinguish between teasing, distasteful jokes, sporadic rude language, vulgarity, stupidity, offhand comments, and insensitive treatment and "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive" based on a protected characteristic. Id. at 82 (emphasis added); Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772–73 (4th Cir. 1997).

Although hostile work environment claims often involve repeated conduct, an "isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." Boyer-Liberto, 786 F.3d at 277 (quotations and alterations omitted); see Pryor v. United Air Lines, Inc., 791 F.3d 488, 496 (4th Cir. 2015); Okoli, 648 F.3d at 220 & n.5. In assessing the severity of the harassing conduct, the status of the harasser is an important factor. See Boyer-Liberto, 786 F.3d at 278; Sonnier v. Diamond Healthcare Corp., 114 F. Supp. 3d 349, 356 (E.D. Va. 2015). A "supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998); see Boyer-Liberto, 786 F.3d at 278.

To impute liability to an employer for an employee's harassment, a plaintiff must demonstrate

18

that "after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer had taken no prompt and adequate remedial action to correct it." Mikels v. City of Durham, 183 F.3d 323, 329 (4th Cir. 1999) (alteration and quotation omitted) (collecting cases); see Pryor, 791 F.3d at 498; Freeman, 750 F.3d at 423; E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 669 (4th Cir. 2011); E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008). As for an employer's remedial actions, "Title VII requires only that the employer take steps reasonably likely to stop the harassment." Bazemore v. Best Buy, 957 F.3d 195, 202 (4th Cir. 2020) (quotation omitted); see Xerxes Corp., 639 F.3d at 669. In assessing remedial actions, the court must consider, inter alia, "the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective" in stopping the conduct of which plaintiff complains. Xerxes Corp., 639 F.3d at 669; see Bazemore, 957 F.3d at 202; Pryor, 791 F.3d at 498. "[S]o long as discipline is reasonably calculated to end the [offensive] behavior, the exact disciplinary actions lie within [the employer's] discretion." Bazemore, 957 F.3d at 202. "A remedial action that effectively stops the harassment will be deemed adequate as a matter of law." Xerxes Corp., 639 F.3d at 670 (quotation omitted); Bazemore, 957 F.3d at 201–02.

During Ali's deposition, Ali discussed numerous exhibits and described what he considered to be all incidents forming the basis of his hostile work environment claim. See Ali Dep. [D.E. 81-5] 27–46. As for Daneshpayeh, Ali contends that in early 2018 Daneshpayeh sought to have Kurdish linguists transferred to places where their skills were not needed and that this management was frustrating. See id. at 27. Ali also believed Daneshpayeh was moody and rude, particularly to Kurdish linguists. See id. Ali relayed these complaints to Dickenson in March 2018.

19

As for Ali's co-worker linguists, Ali alleged that Arabic linguist Ali Sayd did not properly train him in August 2018, but admitted that he was not aware of anyone telling Sayd to train him, that he did not ask Sayd to train him, and that he figured things out based on his own training and experience. See id. at 15–16. Ali never reported his alleged lack of training to WorldWide.

Ali also believed that the Arabic linguists were jealous of Kurdish/Arabic linguists because Kurdish/Arabic linguists were paid more. In addition, in August 2018, Arabic linguists Ahmen Abdulrahman (a/k/a "AJ") falsely introduced himself to Ali as a quality control linguist. See id. at 28–29, 32. Ali did not believe AJ and reported AJ's alleged false statement to WorldWide's acting site manager Bobby Acer. See id. Acer later told Fackender about Ali's report, and when Fackender returned from leave in late August 2018, Fackender disciplined AJ. See id. AJ thereafter had a grudge against Ali. See id.

Ali also testified that from August 2018 until April 2019 he was on the graveyard shift (i.e., 0100 to 0900) by himself. See id. at 16–19. Other linguists worked the morning shift (i.e., 0900 to 1700) and the evening shift (i.e., 1700 to 0100). In February 2019, the U.S. Military Client Team Leader added Arabic linguist Mariam Thompson to the graveyard shift. In April 2019, the U.S. Military Client Team Leader moved Ali to the evening shift. In August 2019, the U.S. Military Client Team Leader temporarily moved Ali to the morning shift. See id.

In July 2019, Arabic linguist Khalid Heali aggressively told Ali that he (Heali) had control over which shift Ali would work. See id. at 29–31. Ali reported Heali's comments to Timothy Ledbetter, who recently had become the U.S. Military Client Team Leader and who had overall responsibility for the shifts. See id. Ali also told Fackender about Heali's comments, that the Arabic linguists were jealous of the Kurdish/Arabic linguists' higher pay, and that AJ and Heali made the

20

work environment toxic. See id. at 30–32.

According to Ali, after Ali told Ledbetter about Heali's comments, Ledbetter held a meeting with the linguists and told them that he would consider any report by the linguists to the WorldWide site manager to be a security breach that could jeopardize the linguist's security clearance. See id. at 32. Ali, in turn, reported Ledbetter's comment to Fackender. See id. at 32–33. Fackender told Ali that he was not happy about Ledbetter's comment and to hang tight. See id.

Ali also claims that Arabic linguist Robbie Bahary once said that Kurds participated in the genocide of Christian Chaldeans during World War II. See id. at 40–41. Ali viewed the comment as reflecting anti-Kurdish animus. See id. Ali did not report this comment to WorldWide.

Ali also claims that AJ once commented on Ali's facial appearance and said Ali had "retarded, Mongolian looks", that Kurds had flat heads, that Kurds were retarded, and that Kurds had no common sense. Id. at 41. AJ also said that former Iraqi dictator Saddam Hussein directed genocide at the Kurds and that Ali was a "retarded, disabled veteran." Id. Ali did not report these alleged comments to WorldWide.

As for Ledbetter, Ali said he observed Ledbetter show favoritism towards some Arabic linguists. The alleged favoritism included (1) giving some Arabic linguists 24-hour access to a vehicle; (2) allowing off-base travel for some Arabic linguists for doctor visits and entertainment without having to give 48 hours notice to Ledbetter; (3) giving some Arabic linguists more favorable shifts; (4) socializing with some Arabic linguists; (5) allowing some Arabic linguists to purchase, possess, and consume alcohol; and (6) allowing Arab linguist Abdulrahmen Ahmed (a/k/a/ "AJ") to have his own private email account. See id. at 33–39, 44–46. Ali also claimed that Ledbetter was angry on September 1, 2019, when he learned that WorldWide promoted Ali to Category III linguist.

21

See id. at 41–44.

During Waly's deposition, Waly described what he considered to be all the incidents forming the basis of his hostile work environment claim and discussed numerous exhibits. See Waly Dep. [D.E. 81-6] 11–22, 30–31, 34–35, 47–48, 49–52, 74. Between July 2018 and August 2019, Waly claimed that (1) Arab linguist Mariam Thompson bullied him; (2) Arab linguist Robbie Bahany envied Kurdish people; and (3) Arab linguist Abdulrahman Ahmad (a/k/a "AJ") disliked Kurdish linguists. See id. at 11–12. According to Waly, Waly once had an account issue and a military team leader named Stephanie helped Waly with the issue. Arab linguist Ali Sayd later told Waly to speak with him (not Stephanie) to resolve such issues. Id. at 17–19. Waly also testified that Arab linguist Mariam Thompson did not have to give Christopher Ledbetter 48 hours notice in order to go into town to see a doctor, but Ledbetter required Waly to give such notice. See id. at 20–22. Arab linguist Mariam Thompson also once accused Waly of spying on her for WorldWide site manager Timothy Fackender. Id. at 21. Waly also testified that Arab linguist Ali Sayd once drove Arab linguist Mariam Meleh and Arab linguist Ayden on a mission and did not take Waly. When Waly asked why Waly did not go on the mission, Sayd said, "you cannot run if we get attacked or ambushed." Id. at 32. Sayd also created inconsistent shifts for linguists, including a distinct work shift for his paramour Arabic linguist Mariam Maleah and for his friend Arabic linguist Robbie Bahary. Id. at 34–35.

Waly said that Arab linguist Robbie Bahary once came into the room where linguists were working. Bahary was holding a bottle of whisky and was intoxicated. Bahary told a "joke" about a Kurdish male who undressed at the doctor's office. The Arabs in the doctor's office laughed at the naked Kurdish male. Bahary told another "joke" about a Kurdish husband and wife who committed

22

adultery in order to have a baby. Id. at 47–48. After the second "joke," Waly told Bahary to leave, and Bahary did. Id. at 48. Two other Arab linguists then complained to Waly about stopping the "good time" they were having. Id. Waly also heard from Ali Sayd that AJ and Robbie Bahary once made fun of how Waly walked behind Waly's back, and Sayd told them to stop. Id. at 51. Arab linguist Feras Sami once admonished Waly for giving the code to the base to a military team member named Josh when Josh drove Waly back to the base. Id. at 55.

As for complaints that Waly reported to WorldWide during his employment, Waly testified that he told Fackender in July 2018 that there were insufficient Kurdish translations to do. See id. at 14–15. Waly later told Fackender's assisstants Robert Holmes and Josh Andrew that AJ played video games or watched European football during the evening shift, would yell about the games, and the noise disturbed Waly. See id. at 15–16. Finally, Waly told Fackender that Arabic linguist JoJo Josher was sending Arabic linguists AJ, Robbie Bahany, and Miriam Thompson on missions. See id. at 15–17. Fackender responded that the military officer knew JoJo Josher very well due to Josher's long service. See id. at 16–17; see also id. at 19.

To sustain a hostile work environment claim, a plaintiff must show that his protected characteristic was the "but for" cause of the alleged harassment. See Gilliam, 474 F.3d at 142; Ocheltree, 335 F.3d at 338.[4] Even viewing the record in the light most favorable to Ali, no rational

---

[4] A mixed-motive analysis does not apply to a hostile-work-environment claim. See Stacks v. Sw. Bell Yellow Pages, Inc., 27 F.3d 1316, 1326 (8th Cir. 1994); Berry v. Maker's Mark Distillery, Inc., No. 3:12-CV-185, 2014 WL 1761922, at *10 n.12 (W.D. Ky. Apr. 30, 2014) (unpublished); Everhart v. Bd. of Educ. of Prince George's Cnty., No. CV PJM 11-1196, 2014 WL 12666717, at *2 (D. Md. Aug. 26, 2014) (unpublished). A mixed-motive analysis applies in situations where an adverse employment action is challenged and both legitimate and illegitimate considerations played a part in that decision. Stacks, 27 F.3d at 1326. "An employer could never have a legitimate reason for creating a hostile work environment." Id.

23

jury could find the but-for causation required to support Ali's hostile work environment claim. Much of the alleged harassing conduct that Ali cites was not motivated by race or national origin, but by discord over the higher pay for Kurdish/Arabic translators and other various interpersonal grudges. See, e.g., [D.E. 81-5] 31–32, 55; WWSOF ¶ 13. As for the alleged comments from coworker linguist AJ regarding Ali's "looks" and coworker linguist Bahary's comments about Kurds and World War II, these comments were not severe enough or made pervasively enough to sustain a hostile work environment claim. See, e.g., Parker, 915 F.3d at 304; Irani, 767 F. App'x. at 416–17; Bonds, 629 F.3d at 385–86; Belton v. City of Charlotte, 175 F. App'x 641, 657 (4th Cir. 2006) (per curiam) (unpublished); Baqir, 434 F.3d at 746–47; Hartsell, 123 F.3d at 771–74. The same conclusion applies to the alleged harassing conduct that Waly cites, including the comments of various co-worker linguists.

"In a perfect world, each workplace would be entirely harmonious and no . . . co-worker would ever make an insensitive comment, irritate a colleague, or engage in a petty slight." Iskander v. Dep't of Navy, 116 F. Supp. 3d 669, 677 (E.D.N.C. 2015), aff'd, 625 F. App'x 211 (4th Cir. 2015) (per curiam) (unpublished). Common experience and collective wisdom teach, however, that people are not angels. Some people are petty, offensive, ignorant, and unkind. "Congress and the Supreme Court . . . have made clear that Title VII [and section 1981 do] not require . . . a utopian workplace in order for an employer to avoid liability for a hostile work environment." Iskander, 116 F. Supp. at 677. Some of the comments that Ali and Waly heard from co-workers were insensitive, offensive utterances. Nonetheless, even viewing the record in the light most favorable to Ali and Waly, no rational jury could find the utterances sufficiently "severe" or "pervasive" to alter the conditions of employment and create a hostile work environment under Title VII or section 1981. See, e.g.,

24

Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; Irani, 767 F. App'x at 415–17; Bonds, 629 F.3d at 385–86; Baqir, 434 F.3d at 746–47; Hartsell, 123 F.3d at 771–74; cf. Boyer-Liberto, 786 F.3d at 277–81; Walker, 775 F.3d at 207–10; Freeman, 750 F.3d at 420-24; Okoli, 648 F.3d at 220–22.

As for Waly's hostile work environment claim, many of the "facts" Waly cites in his memorandum of law in opposition to WorldWide's motion for summary judgment appear only in Waly's "declaration of support" filed in response to WorldWide's motion for summary judgment and appear nowhere else in the record (including Waly's deposition). See [D.E. 93]. For example, Waly claims for the first time in his "declaration of support" that linguists were "incited to physically threaten or scream and yell at Waly" and that other linguists were told to not associate with Waly because of his race. See id. at 12. Other facts cited in Waly's memorandum of law in opposition to WorldWide's motion for summary judgment, such as other linguists allegedly calling Kurds murders or praising Saddam Hussein for killing Kurds, have no citation to the record. See id. Waly cannot create a genuine issue of material fact by adding assertions in a declaration that contradict his deposition testimony or by making unsubstantiated arguments in briefing in opposition to summary judgment. See, e.g., Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999); Williams v. Genex Servs., LLC, 809 F.3d 103, 110 (4th Cir. 2015); Stevenson v. City of Seat Pleasant, 743 F.3d 411, 422 (4th Cir. 2014); Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 438 (4th Cir. 1999); Rohrbough v. Wyeth Lab'ys, Inc., 916 F.2d 970, 974–76 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham

25

issues of fact." (citation omitted).[5] Even viewing the record in the light most favorable to Waly, no rational jury could find the alleged conduct was sufficiently severe or pervasive to alter the conditions of employment and create a hostile work environment.

Alternatively, to the extent Ali and Waly complain about Ledbetter, even viewing the record in the light most favorable to Ali and Waly, no rational jury could impute the allegedly discriminatory acts of Ledbetter to WorldWide as a joint employer. Some of the disparate treatment that Ali and Waly cites stem from decisions of Ledbetter. In order for WorldWide to be liable for the actions of Ledbetter, Ali and Waly must demonstrate that the U.S. Military Client (i.e., SOCOM) was effectively the "agent" of WorldWide. See Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 408–410, 413 (4th Cir. 2015); Swindell v. CACI NSS, Inc., No. 5:17-CV-617, 2020 WL 5824024, at *7 (E.D.N.C. Sept. 30, 2020) (unpublished), aff'd, No. 20-2179, 2022 WL 3754531 (4th Cir. Aug. 30, 2022) (per curiam) (unpublished). A joint employer that had actual or constructive knowledge of the discriminatory action and failed to take corrective measures within its control also can be found jointly liable. See Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 228 (5th Cir. 2015); Butler, 793 F.3d at 408–10, 413; Swindell, 2020 WL 582404, at *7–8 .

Ali and Waly have cited no evidence suggesting that SOCOM was effectively the agent of WorldWide or that WorldWide had actual or constructive knowledge of Ledbetter's alleged discriminatory actions and failed to take corrective measures within its control. Indeed, Ali and Waly concede that WorldWide had limited information about SOCOM's activities, was not aware of SOCOM's decisionmaking processes, and had no control over SOCOM's day-to-day staffing

---

[5] This same principle applies to Ali's declaration and briefing in opposition to WorldWide's motion for summary judgment. See [D.E. 100] 1–3.

Case 5:20-cv-00638-D   Document 110   Filed 08/09/23   Page 26 of 41

decisions involving linguists. See [D.E. 88] 14–15. Therefore, no rational jury could impute the alleged discriminatory actions of Ledbetter or the U.S. Military Client to WorldWide. See, e.g., Swindell, 2022 WL 5824024, at *12.

In opposition, Ali and Waly argue that Ledbetter gave certain linguists in Waly's workplace additional authority, facilitating the linguists' alleged harassing conduct. See [D.E. 80] ¶¶ 14–15. Ledbetter, however, was an employee of the U.S. Military Client, and WorldWide did not authorize Ledbetter to make these alleged delegations or control how Ledbetter managed linguists.

Alternatively, WorldWide has carried its burden under the Faragher-Ellerth defense. Under Faragher-Ellerth, an employer can assert an affirmative defense for unlawful co-worker harassment. See Faragher, 524 U.S. at 807–08. Likewise, if a supervisor subjects a subordinate employee to unlawful harassment, but the supervisor's unlawful harassment does not culminate in tangible employment action, then the employer may also assert the affirmative defense. See Faragher, 524 U.S. at 807–08; Burlington Indust. v. Ellerth, 524 U.S. 742, 762–63, 765 (1998); Brown v. Perry, 184 F.3d 388, 394–97 (4th Cir. 1999); Lissau v. S. Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense. If [plaintiff's] termination did not result from a refusal to submit to [her supervisor's unlawful] harassment, then [the employer] may advance [the affirmative] defense."). The Faragher-Ellerth defense requires the employer to prove: (1) "that the employer exercised reasonable care to prevent and to correct promptly any . . . harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; see Ellerth, 524 U.S. at 765; Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 264–69 (4th Cir.

27

2001); Lissau, 159 F.3d at 182; Swindell, 2020 WL 5824024, at *4, Swann v. Source One Staffing Solutions, 778 F. Supp. 2d 611, 618–19 (E.D.N.C. 2011).

Ali and Waly's arguments in opposition focus on the U.S. Military Client's alleged failure to act, Ali's complaints to Dickenson about Daneshpayeh and to Fackender about Ledbetter, and Waly's complaints to WorldWide before, during, and after his exit interview. See [D.E. 88] 20–24. Ali and Waly also contend that WorldWide's reporting and anti-harassment policies were ineffective and adopted in bad faith. See id.

Plaintiffs' arguments regarding the U.S. Military Client fail. Even viewing the evidence in the light most favorable to plaintiffs, no rational jury could find that either plaintiff ever complained to WorldWide that the U.S. Military Client, including Ledbetter, was creating a hostile work environment based on their race, national origin, or disability.

As for Ali's complaints about Daneshpayeh, WorldWide took prompt remedial action to remove Daneshpayeh as Ali's supervisor in light of complaints against Daneshpayeh. See [D.E. 81-1] ¶ 33; [D.E. 81-3] ¶ 9. Removing Daneshpayeh from Ali's workplace stopped Daneshpayeh's allegedly harassing behavior. Ali's subjective belief that WorldWide's remedial action did not sufficice does not overcome the Faragher-Ellerth defense. See, e.g., Faragher, 524 U.S. at 807–08; Ellerth, 524 U.S. at 762–63; Xerxes Corp., 639 F.3d at 670; Swindell, 2020 WL 5824024, at *14–15; Swann, 778 F. Supp. 2d at 618–22. Moreover, that Ali benefitted from WorldWide's reporting system and harassment policy in 2018 regarding Daneshpayeh's behavior refutes Ali's argument that WorldWide's policies were not effective or adopted in bad faith. Furthermore, neither Ali nor Waly ever reported an alleged hostile work environment to Fackender.

As for Waly, as discussed, Waly described his complaints during his employment as follows.

28

First, in July 2018, he complained to Fackender about not having enough Kurdish translations to do. See Waly Dep. at 14–15. Second, he complained to Fackender's assistants Robert Holmes and Josh Andrew that Arab linguist AJ played video games or watched European football matches during the night shift and would yell about the games. Id. at 15–16. AJ's yelling made it hard for Waly to concentrate. Id. Third, Waly complained to Fackender that Arab linguist JoJo Josher was sending Arab linguists AJ, Robbie Bahary, and Mariam Thompson on missions instead of Waly. Id. at 15–17. Fackender responded that the military officers of the U.S. Military Client knew JoJo Josher due to Josher's long service in Iraq. Id. at 16–17. As for Waly's complaints at the end of his employment, Waly completed a form as part of his exit interview and vaguely alleged bullying due to his Kurdish race, his Iraqi Kurdistan national origin, and his disability (i.e., having polio as a child that affected his right leg and foot but did not require any accommodation). See id. at 11, 18. Waly admits that he did not describe the alleged anti-Kurdish bullying to Robyn Dickinson in human resources until returning to the United States after his resignation. See id. at 14, 19.

Waly unreasonably failed to take advantage of WorldWide's preventative or corrective opportunities. See Barrett, 240 F.3d at 264, 267–69; Lissau, 159 F.3d at 182. And, Waly's alleged abstract fear that he would be fired if he complained to WorldWide about alleged harassment after WorldWide terminated Ali's employment in September 2019 does not make WorldWide's policies and procedures objectively ineffective. See, e.g., Barrett, 240 F.3d at 264, 267–69; Lissau, 159 F.3d at 182. Thus, the court grants WorldWide's motion for summary judgment on plaintiffs' hostile work environment claims.

### B.

Plaintiffs allege race and national origin discrimination claims under Title VII and section

29

1981. Title VII prohibits an employer from taking adverse employment action against an employee because of such individual's race or national origin. See 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits race discrimination in contracting. See 42 U.S.C. § 1981. A plaintiff may establish a Title VII or section 1981 violation in two ways. First, a plaintiff can show through direct evidence that illegal discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence (as in this case), a plaintiff can alternatively proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).

The McDonnell Douglas framework consists of three steps: "(1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 216 (4th Cir. 2016). The McDonnell Douglas framework applies to failure to hire, termination, and retaliation claims under Title VII and section 1981. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004); Beall v. Abbott Lab'ys, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam, 474 F.3d at 134.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex.

30

Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted), abrogated in part on other grounds by Gross v. FBL Fin. Servs., 557 U.S. 167, 177–80 (2009); see Reeves, 530 U.S. at 147.

In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on an illegal basis. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext under Reeves and its Fourth Circuit progeny. Under Reeves and its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [race]." Laber v. Harvey, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. See id. at 431; Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 651 n.2 (4th Cir. 2021); Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

31

To establish a prima facie case concerning each termination claim, each plaintiff must show that (1) he is a member of a protected class, (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of his discharge, and (4) he was treated differently than a similarly situated employee outside the protected class. See, e.g., Goode v. Cent. Va. Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015), abrogated in part on other grounds by Bing v. Brivo Sys., LLC, 959 F.3d 605, 611–12 (4th Cir. 2020); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Tahir v. Sessions, No. 5:16-CV-781-D, 2017 WL 1735158, at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished).

In light of the U.S. Military Client's reasons for dismissing Ali from the SOCOM contract, Ali was not fulfilling WorldWide's legitimate expectations at the time of his discharge. Moreover, no rational jury could impute the U.S. Military Client's decision to remove Ali from the SOCOM contract to WorldWide. Furthermore, just because Ali subjectively disagrees with SOCOM's assessment of Ali's performance and behavior does not create a genuine issue of material fact regarding WorldWide's decision to terminate Ali. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); Swindell, 2020 WL 5824024, at *19; Felton, 295 F. Supp. 3d at 604; McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006). Thus, Ali has failed to establish a prima facie case.

Alternatively, even viewing the record in the light most favorable to Ali, WorldWide did not treat Ali differently from a similarly situated employee outside the protected class. In opposition, Ali contends that he was replaced with an Arabic translator named "Salam" and references other alleged misconduct from Arabic translators who the U.S. Military Client did not discipline. See

32

[D.E. 92-1] ¶ 45.

As discussed, Ali first referenced "Salam" in a declaration filed in response to WorldWide's motion for summary judgment. See id. Ali, however, cannot create a genuine dispute of material facts by adding assertions in declarations unsupported by the evidentiary record. See, e.g., Hernandez, 187 F.3d at 438. Moreover, Ali provides no admissible evidence about "Salam" that demonstrates that "Salam" was similarly situated to Ali. For example, Ali claims to know that "Salam" is an Arabic linguist and was hired to replace Ali. Ali supposedly heard this information from Ali's friend, Rusty Qader. Qader allegedly learned this information from Salam himself, who allegedly heard from members of Ali's SOCOM team that "Salam" replaced Ali in order to form an all-Arab linguist team. See [D.E. 92-4] ¶ 6. This untimely and inadmissible triple hearsay does not create a genuine issue of material fact on the fourth element of Ali's prima facie case.

As for other evidence, Ali alleges that the U.S. Military Client did not discipline or terminate some Arabic translators despite misconduct allegations. See [D.E. 88] 8. This alleged disparate treatment of the U.S. Military Client, however, is not attributable to WorldWide. Moreover, Ali has failed to demonstrate that WorldWide, not the U.S. Military Client, continued to employ a linguist of a different race or national origin after a client terminated that linguist from the SOCOM contract.

Even viewing the record in the light most favorable to Ali, Ali has failed to create a genuine issue of material fact concerning Ali's prima facie case or pretext. See Holland, 487 F.3d at 217–18; Hux v. City of Newport News, Va., 451 F.3d 311, 317–19 (4th Cir. 2006); Diamond, 416 F.3d at 319, Anderson, 406 F.3d at 270–73; Honor, 383 F.3d at 189; Mereish, 359 F.3d at 336–39; Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649–50 (4th Cir. 2002); Dugan v. Albemarle Cnty. Sch. Bd., 293 F.3d 716, 722–23 (4th Cir. 2002); Rowe, 233 F.3d at 830; Hawkins, 203 F.3d

33

at 279–80; Causey v. Balog, 162 F.3d 795, 802–03 (4th Cir. 1998); Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); Swindell, 2020 WL 5824024, at *19; McDougal-Wilson, 427 F. Supp. 2d at 607–08. Thus, the court grants summary judgment to WorldWide on Ali's race and national origin discrimination claims.

As for Waly's race and national origin discrimination claims, WorldWide contends that Waly cannot establish a prima facie case because WorldWide did not discharge him. Waly responds that WorldWide constructively discharged him on September 24, 2019.

A constructive discharge claims requires Waly to prove his "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Green v. Brennan, 578 U.S. 547, 555 (2016) (quotation omitted); see Pa. State Police v. Suders, 542 U.S. 129, 147 (2004); Chapman, 48 F.4th at 235; E.E.O.C. v. Consol. Energy, Inc., 860 F.3d 131, 144–45 (4th Cir. 2017). The standard for intolerable working conditions sufficient to create a constructive discharge is higher than that for a hostile work environment claim under Title VII and section 1981. See Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019). "[M]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions" do not constitute objectively intolerable conditions. Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006) (quotation omitted).

"Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, [the Fourth Circuit] has insisted that it be carefully cabined." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 187 (4th Cir. 2004) (quotation omitted), abrogated on other grounds by Chapman, 48 F.4th at 235. Thus, a plaintiff who fails to prove that changes to the terms and conditions of employment created a hostile work environment under Title

34

VII, by definition, also fails to prove a constructive discharge under Title VII (i.e., working conditions "so intolerable that a reasonable person would have felt compelled to resign"). See, e.g., Suders, 542 U.S. at 147.

Waly argues that WorldWide constructively discharged him on September 24, 2019. See [D.E. 93] 24. According to Waly, in the wake Ali's termination, Waly feared for his security clearance if he complained about race, national origin, or disability discrimination and "the idea of continued harassment with [Waly] as the lightning rod was intolerable to him." Id. Waly also cites Waly's alleged belief that Fackender would not help him if he complained. See id.

Even viewing the record in the light most favorable to Waly, no rational jury could find that WorldWide's actions by September 24, 2019, made work so intolerable that Waly was forced to resign. Notably, Waly had discussed resigning on two separate occasions before his resignation on September 24, 2019, for reasons unrelated to Waly's race, disability, or national origin. Waly first discussed resigning in July 2018 due to a lack of interesting or substantive work assignments. See WWSOF ¶ 84; PSOF ¶ 84. In spring 2019, Waly once discussed resigning due to interpersonal "drama" in the unit unrelated to Waly's race or national origin. See WWSOF ¶ 86; PSOF ¶ 86. Fackender consistently attempted to dissuade Waly from resigning and actively sought to placate Waly. See WWSOF ¶¶ 84–86; PSOF ¶¶ 84–86.

To the extent Waly experienced an unpleasant work environment, no rational jury could find that Waly's working conditions became so intolerable that a reasonable person would have felt compelled to resign on September 24, 2019. In opposition to this conclusion, Waly cites Amirmokri v. Baltimore Gas & Electric Co., 60 F.3d 1126 (4th Cir. 1995). In Amirmokri, the plaintiff's supervisor called plaintiff racial epithets daily and attempted to publicly humiliate him on multiple

35

occasions. See id. at 1132. Plaintiff reported this daily harassment to upper-level supervisors for five months without relief. See id. at 1129. As a direct result of this daily behavior, plaintiff developed ulcers and resigned for medical reasons. See id.

The facts of this case bear no resemblance to Amirmokri. Waly has not claimed that his WorldWide supervisor (i.e., Fackender) subjected Waly to any harassment. The only alleged harassment Waly experienced came from his coworker linguists under the SOCOM contract. Unlike in Amirmokri, the alleged harassment did not rise to an actionable level under Title VII or section 1981. Moreover, unlike in Amirmokri, Waly failed to make any reports to Fackender or WorldWide about the alleged harassment until his exit interview. Thus, the court grants WorldWide summary judgment on Waly's race and national origin discrimination claims.

## C.

Plaintiffs also allege retaliation. Plaintiffs have no direct evidence of retaliation and proceed under the McDonnell-Douglas burden-shifting framework. To state a prima facie claim for retaliation in violation of Title VII and section 1981, an employee must show that (1) he engaged in protected activity, (2) his employer took an action against him that a reasonable employee would find materially adverse, and (3) a casual connection existed between the protected activity and the adverse employment action. See Laurent-Workman, 54 F.4th at 218; DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015); Boyer-Liberto, 786 F.3d at 281; Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001); Brown v. Goodwill Indus. of E. N.C., Inc., No. 4:17-CV-144, 2018 WL 2422315, at *2 (E.D.N.C. May 29, 2018) (unpublished); Johnson v. Pitt

36

Cnty. Bd. of Educ., No. 4:16-CV-214, 2017 WL 2304211, at *12 (E.D.N.C. May 25, 2017) (unpublished); see also Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362–63 (2013); White, 548 U.S. at 67–70.

If a plaintiff establishes a prima facie case, the burden shifts to "the employer to rebut the presumption of retaliation by articulating a legitimate[,] nonretaliatory reason for its actions." Beall, 130 F.3d at 619; see Burdine, 450 U.S. at 254; Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves, 530 U.S. at 142–43; King, 328 F.3d at 150–54. A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish, 359 F.3d at 336 (quotation omitted); see Reeves, 530 U.S. at 147.

The court assumes without deciding that Ali established a prima facie case of retaliation. In response, WorldWide offers a non-retaliatory reason for Ali's discharge: SOCOM's decision to terminate Ali from the SOCOM contract and Ali's resulting inability to access the U.S. Military Client's facilities under the SOCOM contract. Even viewing the record in the light most favorable to Ali, no rational jury could find WorldWide's non-retaliatory reason for Ali's termination to be pretextual. In opposition, Ali cites the actions of Ledbetter and the U.S. Military Client and WorldWide's submission of an incident report to the United States regarding Ali's termination from the SOCOM contract. See [D.E. 88] 27–29.

As for Ledbetter's conduct, Ali has failed to provide evidence sufficient to impute liability

for the U.S. Military Client's actions to WorldWide. Therefore, Ali's attempt to challenge the U.S. Military Client's decision to release Ali from the SOCOM contract does not evince that WorldWide's stated reason for terminating Ali was pretextual (i.e., a lie designed to mask illegal retaliation). See Laing v. Fed. Express Corp., 703 F.3d 713, 721–23 (4th Cir. 2013); Swindell, 2020 WL 5824024, at *16–17. Even viewing the record in the light most favorable to Ali, no rational jury could find that WorldWide terminated Ali's employment in retaliation for his 2018 complaints to Dickinson or his 2019 complaints to Fackender. Rather, on September 13, 2019, WorldWide terminated Ali's employment due to Ali's removal from the SOCOM contract and his resulting inability to access the U.S. Military Client's facilities under the SOCOM contract. Without access to the U.S. Military Client's facilities covered under the SOCOM contract, Ali could not perform his duties under his contract with WorldWide. See WWSOF at ¶ 54; PSOF ¶ 54. No evidence suggests that anything other than Ali's removal from the SOCOM contract led to WorldWide terminating Ali's employment. Indeed, in August 2020, with Ali's permission, WorldWide sought to submit Ali's name for consideration as a potential linguist in a contract bid proposal. See WWSOF ¶ 77; PSOF ¶ 77.

As for the incident report, WorldWide had no discretion. WorldWide was legally obligated to submit an incident report whenever an employee with a security clearance is dismissed from a government contract. See WWSOF ¶¶ 60–69; PSOF ¶¶ 60–69. Ali has failed to raise any genuine issue of material facts suggesting that Worldwide unlawfully retaliated against him.

As for Waly, Waly does not make any arguments regarding retaliation in his memorandum

of law in opposition. See [D.E. 93]; [D.E. 101] 10.[6] Therefore, Waly has failed to carry his burden at summary judgment. See Anderson, 477 U.S. at 248–49; Matsushita Elec. Indus. Co., 475 U.S. at 587. Alternatively, even reviewing the record in the light most favorable to Waly, WorldWide did not take any adverse employment action against Waly. Rather, Waly resigned. Accordingly, the court grants summary judgment to WorldWide on plaintiffs' retaliation claims.

## D.

Waly contends that WorldWide discriminated against him and discharged him in violation of the ADA. The alleged discrimination was due to Waly's perceived disability arising from his limp due to childhood polio that affected his right leg and right foot. See Waly Dep. at 45.

Waly has no direct evidence of illegal discrimination under the ADA, and relies on the McDonnell Douglas burden-shifting framework. See Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003). To survive summary judgment on his ADA termination claim, Waly must "produce evidence sufficient to demonstrate that (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (quotations and alterations omitted); see Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004); Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially

---

[6] Waly's failure to make any arguments about retaliation is not surprising in light of his deposition testimony concerning his retaliation claim. See Waly Dep. at 54–55.

Case 5:20-cv-00638-D Document 110 Filed 08/09/23 Page 39 of 41

limits one or more major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1); see 29 C.F.R. § 1630.2(g)(1). Section 12102(3), in turn, states:

> For purposes of paragraph (1)(c):
>
> (A) An individual meets the requirements of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>
> (B) Paragraph 1(c) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42 U.S.C. § 12102(3). Under section 12102(3), which Congress added in the ADAAA, an individual bringing a "regarded as" claim need only show that an employer subjected him to an action that the ADA prohibits because of an actual or perceived impairment regardless of whether the employer perceived the impairment to limit the individual in a major life activity. See 42 U.S.C. § 12102(3); 29 C.F.R. § 1630.2(g)(iii); Olsen v. Cap. Region Med. Ctr., 713 F.3d 1149, 1154 (8th Cir. 2013); Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321–23 (6th Cir. 2012); Harris v. Reston Hosp. Ctr., LLC, No. 1:10-cv-1431, 2012 WL 1080990, at *3–5 (E.D. Va. Mar. 26, 2012) (unpublished). Thus, a "regarded as" claim under the ADAAA is much easier to prove than a "regarded as" claim before the ADAAA. Cf. Young v. United Parcel Service, Inc., 707 F.3d 437, 443–44 (4th Cir. 2013) (analyzing a pre-ADAAA "regarded as" claim), amended and superseded by, 784 F.3d 192 (4th Cir. 2015); Rohan, 375 F.3d at 277–78 (same); Pollard v. High's of Balt., Inc., 281 F.3d 462, 471 n.5 (4th Cir. 2002) (same); Davis v. Univ. of N.C., 263 F.3d 95, 99–101 (4th Cir. 2001) (same); Rhoads, 257 F.3d at 390–91 (same); Haulbrook, 252 F.3d at 703–05 (same).

40

Waly has failed to establish a prima facie case concerning his ADA termination claim. Waly was not fired. Waly resigned. Likewise, during his employment, Waly suffered no adverse employment action due to his alleged disability. Therefore, the court grants WorldWide summary judgment on Waly's ADA discrimination claims.

V.

In sum, the court DENIES plaintiffs' motion to strike confidential designations [D.E. 82], GRANTS defendant's motion to strike the declaration of Rusty Qadar [D.E. 98], and GRANTS defendant's motions for summary judgment [D.E. 76, 78]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 9 day of August, 2023.

J. Dever
JAMES C. DEVER III
United States District Judge

41